RYAN, Appellant, *v.* QUINLAN et al., Respondents.

(No. 3,120.)

(Submitted May 20, 1912. Decided June 10, 1912.)

[124 Pac. 512.]

*Water Rights—Lakes—Overflow—Percolating Waters—Rights of Appropriator—Findings—Insufficient Evidence—Property Rights—Determination of, in Contempt Proceedings.*

Property Rights—Not Determinable in Contempt Proceedings.
  1.  Substantive property rights cannot be adjudicated through the medium of contempt proceedings.

Water Rights—Lakes—Overflow—Appropriation—Burden of Proof.
  2.  Where the natural overflow from a lake reaches a creek, all the water in which has been appropriated, by reasonably ascertainable channels, surface or underground, it is one of its sources of supply, and one who intercepts and appropriates such overflow has the burden of establishing his right to do so.

Same.
  3.  Plaintiff having made a *prima facie* showing that the overflow from a mountain lake, situated upon the public domain, disappeared entirely a short distance from the lake and that beyond such point there was no surface channel nor any indication of an underground channel in the direction of a creek to which such overflow was claimed by the defendants to be tributary, the burden was upon them to show

(521)

that, if uninterrupted, the flow finds its way into the creek by a defined channel either upon the surface or underground, and that plaintiff's appropriation of it diminished the volume of water flowing in the creek to which they were entitled.

Same—Percolating Waters—Rights of Appropriator.

4. Percolating water is not governed by the same rules that are applied to running streams; subject to the limitation embodied in the maxim, "*Sic utere tuo ut alienum non lædas*," the proprietor of the soil where such water is found has the right to control and use it as he pleases for the purpose of improving his own land, though his use or control may incidentally injure an adjoining proprietor.

Same—Subsurface Waters—Rules Governing.

5. Subsurface water flowing in defined channels, reasonably ascertainable, is subject to the same rules as water flowing in surface streams; there being, however, no presumption that such water, in whatever form found, is tributary to any stream.

Same—Subsurface Waters—Tributary to Stream—Circumstantial Evidence.

6. One who asserts that subsurface water is tributary to a certain stream may establish such fact by circumstantial evidence having so much of substance and probative value as will reasonably exclude the contrary hypothesis.

Same—Percolation—Findings—Insufficient Evidence.

7. Under the rule that findings based upon speculation rather than substantive evidence may not be allowed to stand, the conclusion of the district court in a water right suit that the overflow water from a mountain lake, which entirely disappeared some 3,600 feet from a creek to which it was alleged to be tributary, reached such creek by percolation, *held* erroneous, where there was not any evidence upon which such a finding could be based.

*Appeal from District Court, Powell County; W. R. C. Stewart, Judge of the Ninth Judicial District, presiding.*

ACTION by Jeremiah Ryan against John Quinlan and others. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

*Mr. T. P. Stewart,* and *Messrs. Rodgers & Rodgers,* submitted a brief in behalf of Appellant. *Mr. Stewart* and *Mr. Hiram W. Rodgers* argued the cause orally.

Where waters do not flow in a well-defined stream upon the surface of the earth, but disappear under the surface of the ground, they are presumed not to be tributary to any particular stream of water, and the burden of proof is upon the person asserting such waters to be tributary to any particular stream to establish such fact. And the fact that waters flowing in the earth and not flowing in a well-defined stream upon the surface of the earth are tributary to any particular stream can only be estab-

lished by showing that they flow in a well-defined and known underground channel or subterranean stream. (*City of Los Angeles* v. *Pomeroy,* 124 Cal. 597, 57 Pac. 585; *Wheelock* v. *Jacobs,* 70 Vt. 162, 67 Am. St. Rep. 659, 43 L. R. A. 105, 40 Atl. 41; *Tampa Water Works Co.* v. *Cline,* 37 Fla. 586, 53 Am. St. Rep. 262, 33 L. R. A. 376, 20 South. 780; *Hanson* v. *McCue,* 42 Cal. 303, 10 Am. Rep. 299; *Metcalf* v. *Nelson,* 8 S. D. 87, 59 Am. St. Rep. 746, 65 N. W. 911; *Gould* v. *Eaton,* 111 Cal. 639, 52 Am. St. Rep. 201, 44 Pac. 319.)    There being no evidence in the record to prove that after the Blind lake waters disappear they flow in any well-defined channel, or known subterranean stream underground, the law presumes, under such circumstances, and such presumption obtains unless overthrown by proof, that such water, after it disappears beneath the surface of the earth, becomes what is known as percolating waters. (See notes in *Wheelock* v. *Jacobs,* 67 Am. St. Rep. 670, 671.)    It is impossible to identify percolating waters.    Percolating waters are not tributary to any particular stream.    Nor do such percolating waters, as a matter of fact, necessarily flow into the nearest stream or the stream within the watershed of the surface ground, underneath which such percolating waters are found. (*Wheatley* v. *Baugh,* 25 Pa. 528, 64 Am. Dec. 721; *Roath* v. *Driscoll,* 20 Conn. 533, 52 Am. Dec. 352; *Southern Pacific R. R. Co.* v. *Dufour,* 95 Cal. 615, 19 L. R. A. 92, 30 Pac. 783.)    The proposition that percolating waters are within the watershed of a certain stream is no proof in itself that they ever find their way into such stream. (*Leonard* v. *Shatzer,* 11 Mont. 422, 28 Pac. 457.)    Unless it appears that underground water, in a given case, flows in a defined and known channel, it will be presumed to be percolating water. (*Tampa Water Works Co.* v. *Cline, Hanson* v. *McCue, Metcalf* v. *Nelson,* and *Gould* v. *Eaton, supra; Elster* v. *Springfield,* 49 Ohio St. 82, 30 N. E. 274.)    And to prevent underground waters from being classed as percolating waters, they must flow in an underground stream, the presence and location of which can be ascertained; and in order for such underground stream to be treated as a watercourse, and the waters therein not considered as percolating

.waters, such subsurface stream must be discoverable from the surface of the ground, and no subsurface explorations should be necessary to define its course. (*Case* v. *Hoffman,* 84 Wis. 438, 36 Am. St. Rep. 937, 20 L. R. A. 40, 54 N. W. 793; *Wheatley* v. *Baugh, supra; Haldeman* v. *Bruckhart,* 45 Pa. 514, 84 Am. Dec. 511; *Lybe's Appeal,* 106 Pa. 626, 51 Am. Rep. 542; *Williams* v. *Ladew,* 161 Pa. 283, 41 Am. St. Rep. 891, 29 Atl. 54.)

Under the law it is impossible to appropriate waters which are percolating in the ground, underneath the surface of the earth. Likewise, it is impossible for persons who have appropriated water from a stream to claim any interest in percolating waters merely because such percolating waters are within the earth beneath the surface watershed of such streams. If the appropriators of water from a stream could claim any such right in such percolating waters, then the rule of law that percolating waters cannot be appropriated would be meaningless. (*Crescent M. Co.* v *Silver King M. Co.,* 17 Utah, 444, 70 Am. St. Rep. 810, 54 Pac. 244; *Willow Creek Irr. Co.* v. *Michaelson,* 21 Utah, 248, 81 Am. St. Rep. 687, 51 L. R. A. 280, 60 Pac. 943; *Edwards* v. *Haeger,* 180 Ill. 99, 54 N. E. 176; *Howard* v. *Perrin,* 8 Ariz. 347, 76 Pac. 460; *Howard* v. *Perrin,* 200 U. S. 71, 50 L. Ed. 374, 26 Sup. Ct. Rep. 195; *Mosier* v. *Caldwell,* 7 Nev. 363; *Taylor* v. *Welch,* 6 Or. 198; *Shively* v. *Hume,* 10 Or. 76.)

The contempt proceedings could not have been *res judicata* of the subject matter of this action, and could not have determined or adjudicated that the waters of Blind lake were tributary to Dempsey creek, for the reason that a contempt proceeding does not adjudicate or determine the right to property. It cannot be that the title to a water right could be determined by a summary and collateral proceeding from which there is no appeal, and which is meant only to effect the one purpose of maintaining the dignity and authority of the court. The rule of *res judicata* does not apply to contempt proceedings, neither does a contempt proceeding operate as an estoppel. (*Mack* v. *Levy,* 59 Fed. 468; *Proctor* v. *Cole,* 104 Ind. 373, 3 N. E. 106, 4 N. E. 303; *State* v. *District Court,* 24 Mont. 33, 60 Pac. 493.)   A special proceeding

of a criminal character cannot under any circumstances be *res judicata.* (*Corbley* v. *Wilson,* 71 Ill. 209, 22 Am. Rep. 98; *Hutchinson* v. *M. & M. Bank,* 41 Pa. 42, 80 Am. Dec. 596; *Sea Board Air Line Ry.* v. *O'Quin,* 124 Ga. 357, 2 L. R. A:. n. s., 472, 52 S. E. 427; *Frierson* v. *Jenkins,* 72 S. C. 341, 110 Am. St. Rep. 608, 5 Ann. Cas. 77, 51 S. E. 862.)   Such proceedings could not be *res judicata,* or have operated as an estoppel upon the plaintiff for the further reason that they were not pleaded in defendants' amended answer, and a party who relies upon a judgment as *res judicata,* or as an estoppel, must plead the same. (*Cave* v. *Crafts,* 53 Cal. 135; *McLean* v. *Baldwin,* 136 Cal. 565, 69 Pac. 259; *Briggs* v. *Milburn,* 40 Mich. 512.)

*Mr. J. H. Duffy,* and *Mr. Wingfield L. Brown,* for Respondents, submitted a brief, and argued the cause orally.

Are the waters in controversy seepage or percolating waters, and if so, are such waters the subject of appropriation?   It is evident from the undisputed facts developed at the trial of this case and hereinbefore fully set out, and as evidenced by the transcript on file, that the words "seepage and percolating water" were used by the court in the findings of fact inadvertently, and certainly not in the sense contended for by the appellant.   Mr. Wiel, in his work on Water Rights in the Western States, in section 77, defines percolating waters thus:

"In *Vineland etc. Co.* v. *Azusa etc. Co.,* 126 Cal. 486, 46 L. R. A. 820, 58 Pac. 1057, it is said that percolating water is a phrase of well-defined meaning within the law, adding: 'It is essential to the nature of percolating waters that they do not form part of the body or flow, surface or subterranean, of any stream.   They may either be rain waters which are slowly infiltering through the soil, or they may be waters seeping through the banks or bed of a stream which has so far left the bed and the other waters as to have lost their character as part of the flow.' "   In *City of Los Angeles* v. *Hunter,* 156 Cal. 603, 105 Pac. 755, the court, in defining such waters, says: "In the common-law sense of the term, are those that are vagrant, wandering drops, moving by gravity in any and every direction along the line of least resistance."

Admitting, however, for the purpose of this argument that after the waters in controversy leave the pond or lake, and in their flow down the mountain is so diffused and dispersed as to entirely change its character and become percolating water, we still maintain that such water is subject to appropriation and entitled to the full protection of this court.

The majority of the cases cited by learned counsel for the appellant on this point are from the states that recognize the exclusive doctrine of the common law with reference to riparian rights, and even in such states the rule has been substantially modified, if not reversed, notably in Pennsylvania. (See *Collins v. Chartiers V. G. Co.*, 131 Pa. 143, 17 Am. St. Rep. 791, 6 L. R. A. 280, 18 Atl. 1012.) Again, the facts upon which the cases cited by appellant are based are radically different from the case at bar, are not pertinent, and were decided on principles of law either arising from statutes of the state announcing the decision, or compelled to do so by some rule of the common law not applicable in this state. It will be noticed, in the cases referred to, that the controversy usually arose between the owners of different lands as to whom the percolating waters belonged while percolating through their soil. In this case there is no question as to whom the lands belong in which this water takes its source, and over which it flows from such source to Dempsey creek, it being unsurveyed lands of the public domain. In the case of *Katz v. Walkinshaw*, 141 Cal. 116, 99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766, the court says: "Since the common-law rule that an owner of land was the absolute owner of percolating waters beneath the surface of his land could not be equitably applied to the state of California by reason of its peculiar physical condition, such rule was not adopted in such state as a part of the English common law."

The conduct of the appellant with reference to the waters of Dempsey creek and its tributaries has been a persistent violation of the prior rights of the respondents, and a contemptuous disregard of the judgment and orders of the court and its officers, and a constant source of litigation since 1901. Under the pretended claim that the water in controversy is not tributary to Dempsey

creek, the appellant in this action is now trying to relitigate matters that were finally settled and adjudicated in 1902; this is a fact evidenced by his own testimony and the allegations of his complaint. This he cannot do. (*Water Supply & S. Co.* v. *Larimer & Nols Irr. Co.*, 24 Colo. 322, 46 L. R. A. 326, 51 Pac. 496; *New Mercer Ditch Co.* v. *Armstrong,* 21 Colo. 357, 40 Pac. 989.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This cause is before this court upon appeals by the plaintiff from a decree in favor of defendants and an order denying his motion for a new trial. The controversy involves the right to the use of the water in Blind or Ryan lake, situated in Powell county. Dempsey creek has its source on the eastern slope of a range of mountains extending north and south, and flows through a canyon toward the southeast into the valley, and thence into Deer Lodge river. Blind lake is situated on the public domain, in a depression high up on the eastern slope of the same range, some distance to the southwest. To the north of the lake is a high ridge or backbone, extending several hundred feet to the east beyond the eastern rim of the lake, terminating in a point from which there is a sharp descent to the east, northeast, and south. To the south is another ridge which extends further to the east. Between these, and toward the east and north, extends a canyon, the natural surface of which slopes from the eastern rim of the lake for a distance of 2,725 feet at an average angle or grade of twelve feet to the hundred, and thence, at an angle of about sixteen feet to the hundred, 2,400 feet to the level of Dempsey creek. To the west the country is mountainous. The lake is fed by streams flowing into it from this direction and by flood water from melting snow. Over its eastern rim there is a small flow of water, estimated at from fifteen to forty inches, which follows a well-defined natural channel in the general direction of Dempsey creek. As it descends the slope, the flow gradually decreases in volume until it disappears entirely at or near a point 1,500 feet from the lake, or 3,625 feet from the channel of the creek.

From this point to the channel of the creek there is no surface channel. The underlying area consists of granite boulders, intermixed with sand and gravel. The record does not disclose the character of formation in the surrounding elevations nor of the walls of the canyon. The plaintiff and defendants all own agricultural land situate along Dempsey creek some miles below the lake, and claim, under separate appropriations, rights in various amounts to the use of the water flowing therein. On December 27, 1902, an action, theretofore brought in the district court of Powell county to have adjudicated the extent and relative priorities of these rights, in which all the defendants herein or their predecessors were plaintiffs and the plaintiff herein was the defendant, resulted in a decree which definitely fixed the extent of each right and the date at which it was initiated, and by injunction prescribed the order of use accordingly. By that decree the right of plaintiff was declared to be inferior to those of all the other parties, so that during the dry season he was not thereafter able to have the use of any water. At that time few, if any, of the parties knew of the existence of the lake, except by hearsay, and the question whether it is a tributary of Dempsey creek was not brought directly into the controversy. During the pendency of the action, the plaintiff, having learned of the existence of the lake, concluded from its situation and surroundings that it had no connection with Dempsey creek, and that he could obtain from it an additional supply of water. He thereupon posted at the outlet of the lake his notice of appropriation and made the record required by the statute. He cleaned out the natural channel, and dug a ditch from the point at which the flow of water disappears, a distance of 1,225 feet. From the end of the ditch to the creek he constructed a flume. In order to store a supply of water, he also built a dam along the lower rim of the lake and put in a headgate. By this means he raised the level of the water in the lake to the extent of about four feet. The normal area of the water surface was about four acres. Plaintiff's dam increased it to about five acres. This work having been accomplished during the following two years, plaintiff, having use for the water, permitted a flow of the amount required through the

ditch and flume into Dempsey creek, and, when it reached his ditches below, after allowing ten per cent for loss by evaporation, diverted it and used it. Upon complaint by the defendants, in 1905, and again in 1906, he was fined by the district court for contempt for violation of the decree of 1902, by interfering with the natural flow of water to the use of which the defendants claimed they were entitled. He thereupon brought this action to quiet title to the use of the water flowing from the lake and also that stored therein by means of his dam. He alleges that the flow does not reach, and is not tributary to, Dempsey creek, and that by virtue of his appropriation and the creation of a storage supply by the interception of flood water by means of his dam he has a superior right to the use of 100 inches.

Defendants' answer puts in issue the material allegations of the complaint, and alleges that plaintiff's right was adjudicated by the decree of 1902, and that he is estopped by it to set up the claim now made. The court found in favor of defendants: (1) That the decree of 1902 finally adjudicated the rights of all the parties to the use of the water flowing in Dempsey creek; (2) that the right of plaintiff therein was thereby adjudicated to be inferior to that of all the defendants; (3) that plaintiff's appropriation made in 1902 was of water which is tributary to Dempsey creek; (4) that the normal flow from the lake, when not obstructed by the works and dam erected by plaintiff, reaches the creek and becomes a part of it "by means of open, underground seepage and percolation"; and (5) that after the water leaves the lake it flows "over and down a steep and precipitous route in the direction of and on the watershed of said Dempsey creek" until it enters it and becomes a part of the water therein.

The contention is that the evidence is insufficient to justify the findings. It will be noted that the term "open," used in connection with the phrase "underground seepage and percolation," renders finding 4 unintelligible. To this term as used here must be assigned the meaning "plain, in sight, exposed to view." Water seeping or percolating underground cannot, in the very nature of things, be in plain sight or exposed to view. Doubtless

the term crept into the finding by inadvertence of the trial judge or by mistake of the clerk in preparing the record for the printer. Eliminating this term, the fact found is that the overflow, when not obstructed, finds its way into the creek by seeping or percolating through the earth in the canyon. It will be noted, also, that finding 5 is inconsistent with this finding. But notwithstanding this inconsistency, the court found the ultimate fact that the overflow naturally finds its way into the creek and adds to the volume of its flow. Hence the conclusion that the plaintiff is estopped by the decree of 1902 to assert the claim which he now seeks to establish. We gather from the conclusions of law stated by the trial judge that he was of the opinion, also, that the judgments in the contempt proceedings were of binding import, in that they necessarily implied a construction of the decree as adjudicating plaintiff's rights.

As heretofore stated, the question as to whether the lake is tributary to the creek was not directly involved in the action. The parties were not aware of its existence except by hearsay. Whether, therefore, the plaintiff is estopped by the decree to assert his present claim, depends upon the facts as they actually exist, and not upon a mere construction of it implied by the judgments in the contempt proceedings. Furthermore, so far as the record shows, the violation complained of by the defendants in each instance was an interference with the natural flow of the water in the creek, by which they suffered deprivation. It does not appear that the right of plaintiff to appropriate the overflow of the lake or to use the lake as a reservoir for storage purposes was considered or determined. The judgments are not pleaded. For these reasons they are not to be looked to as aiding the decree or as determinative to any extent of plaintiff's rights. If in fact the lake is not tributary to the creek, the existence of the decree does not make it so, and, though it be conceded that in the contempt proceedings the court undertook to determine the rights now asserted by plaintiff, such [1] determination cannot be given any conclusive effect. Substantive property rights cannot be adjudicated in this summary way. For this purpose the right asserted must be put in issue

by formal pleadings, in the appropriate form of action at law or in equity, and determined after due notice and a hearing according to the mode usual in such cases. (*State ex rel. Boston & Mont. etc. Co.* v. *District Court,* 30 Mont. 96, 75 Pac. 956.) Of course, if the lake is tributary to the creek, the decree of 1902 concludes plaintiff from asserting a right to appropriate the overflow.

The contention of plaintiff, therefore, presents the question: Does the evidence sustain the ultimate finding that the lake is [2] tributary to the creek? The burden was necessarily upon the plaintiff to establish his right to intercept and appropriate the natural overflow from the lake, for if this overflow, however small in volume, reaches the creek by reasonably ascertainable channels, it is one of its sources of supply.

The evidence introduced by plaintiff tended to show that there is a complete disappearance of it at a point 1,500 feet distant [3] from the lake, and that beyond that point there is no surface channel, nor any indication upon the surface of an underground way or channel in the direction of the creek. *Prima facie,* therefore, it was thus made to appear that the overflow does not find its way into the creek. The lake being upon the public domain, the plaintiff was *prima facie* entitled to make use of it and to intercept the overflow as he did, provided that in doing so he did not interfere with the use by defendants of the natural flow in the creek. The burden was then cast upon the defendants to show that, if uninterrupted, the flow finds its way into the creek by a defined channel either upon the surface or underground, and that plaintiff's appropriation of it diminishes the volume of water flowing in the creek. This they undertook to establish by showing the character of the debris filling the canyon, and the configuration of the adjacent country. It does not appear, however, from the statement of any witness, that there is any natural surface channel beyond the point of disappearance. While it does appear that the debris in the canyon is perhaps pervious to water, there was not any attempt to show that this is the fact, nor that the vegetation on the surface prior to plaintiff's diversion indicated a defined watercourse beneath, nor that there

is any sound of running water, nor that there are springs bursting out in the channel below at the mouth of the canyon, nor that the flow of the creek is increased in volume by accession from the lake where it passes the canyon. Nor was it shown whether the creek is upon bedrock, or whether it runs over an impervious filling of the canyon upon which its bed lies. Neither was it made to appear that the formation of the surrounding elevations is impervious to water so that the overflow from the lake must of necessity seek an outlet through the canyon. Indeed, the evidence introduced by the defendants has not sufficient probative force to present a substantial conflict upon the *prima facie* case made by the plaintiff. It is remarkable for what it fails to show, rather than what it does show. The court was evidently of the opinion that since the direction of the flow, so far as it is visible to the eye, is toward the creek, and since the slopes of the surrounding elevations all converge toward the creek, it was impelled to the conclusion stated in the findings. A moment's reflection, however, is sufficient to satisfy a reasonable mind that the evidence furnishes no substantial ground for the inference. When water seeps into the earth, it mingles with the soil and remains suspended therein, or moves through it either by percolation, thus losing its identity as a flowing stream, or passes away by one or more defined channels.

It has been settled by a long line of decisions that percolating [4] water is not governed by the same rules that are applied to running streams. "The secret, changeable, and uncontrollable character of underground water in its operations is so diverse and uncertain that we cannot well subject it to the regulations of law, nor build upon it a system of rules, as is done in the case of surface streams. Their nature is defined, and their progress over the surface may be seen and known and is uniform. They are not in the earth and a part of it, and no secret influences move them; but they assume a distinct character from that of the earth, and become subject to a certain law—the great law of gravitation. There is, then, no difficulty in recognizing a right to the use of water flowing in a stream as private property, and regulating that use by settled principles of law. We think the

practical uncertainties which must ever attend subterranean waters is reason enough why it should not be attempted to subject them to certain and fixed rules of law, and that it is better to leave them to be enjoyed absolutely by the owner of the land as one of its natural advantages, and in the eye of the law a part of it; and we think we are warranted in this view by well-considered cases." (*Chatfield* v. *Wilson,* 28 Vt. 49.) The rule, though variously stated, is recognized by the courts both of England and in this country. (*Acton* v. *Blundell,* 12 Mees. & W. 324; *Dickinson* v. *Grand Junction Canal Co.,* 7 Ex. 2C2; *Chasemore* v. *Richards,* 7 H. L. Cas. 349; *Gould* v. *Eaton,* 111 Cal. 639, 52 Am. St. Rep. 201, 44 Pac. 319; *Wheelock* v. *Jacobs,* 70 Vt. 162, 67 Am. St. Rep. 659, 43 L. R. A. 105, 40 Atl. 41; *Bliss* v. *Greeley,* 45 N. Y. 671, 6 Am. Rep. 157; *Wheatley* v. *Baugh,* 25 Pa. 528, 64 Am. Dec. 721; *Mosier* v. *Caldwell,* 7 Nev. 363; *Strait* v. *Brown,* 16 Nev. 317, 40 Am. Rep. 497; *Forbell* v. *City of New York,* 164 N. Y. 522, 79 Am. St. Rep. 666, 51 L. R. A. 695, 58 N. E. 644; *Taylor* v. *Welch,* 6 Or. 198; *Davis* v. *Spaulding,* 157 Mass. 431, 19 L. R. A. 102, 32 N. E. 650; *City of Los Angeles* v. *Pomeroy,* 124 Cal. 597, 57 Pac. 585; *Metcalf* v. *Nelson,* 8 S. D. 87, 59 Am. St. Rep. 746, 65 N. W. 911; *Katz* v. *Walkinshaw,* 141 Cal. 116, 99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663.) See, also, note to *Wheelock* v. *Jacobs,* reported in 67 Am. St. Rep. at page 659, where the rule is fully discussed and the cases distinguished. The result of it is that the proprietor of the soil, where such water is found, has the right to control and use it as he pleases for the purpose of improving his own land, though his use or control may incidentally injure an adjoining proprietor. The general rule thus stated is subject, however, to the same limitation as the use of the land itself, *viz.,* that embodied in the maxim, *"Sic utere tuo ut alienum non lædas,"* or, as is said in some of the cases, the use must be without malice or negligence. This seems to be in accord with the current of decisions in the United States.

Subsurface water flowing in defined channels reasonably [5] ascertainable is subject to the same rules as water flowing in surface streams; but there is no presumption that any sub-

surface water, in whatever form it may be found, is tributary to any stream. (*City of Los Angeles* v. *Pomeroy,* and *Metcalf* v. *Nelson, supra.*) The burden is upon him who asserts this to [6] be a fact. We think that it may be established by circumstantial evidence, as was done in *Strait* v. *Brown* and *Forbell* v. *City of New York, supra;* but the evidence must have so much of substance and probative value as will reasonably exclude the contrary hypothesis. This court recognized this rule in *Leonard* v. *Shatzer,* 11 Mont. 422, 28 Pac. 457, and in *Hilger* v. *Sieben,* 38 Mont. 93, 98 Pac. 881.

The condition in which this case has reached this court, however, does not require the announcement of any definite rule. It does not appear that the lake water reaches the creek by any [7] means. As we have said, the conclusion reached by the trial court that it does was based upon speculation rather than upon substantive evidence; hence the findings may not be allowed to stand. It is apparent from the disclosures in the record that there are many additional facts readily obtainable, the production of which would enable the trial court to reach a conclusion upon a full disclosure of the facts as they may be made to appear. For this reason, and because of the importance of the legal questions which may require determination, we think it proper to direct a new trial, at which the parties may produce such additional evidence if they desire to do so. We observe, too, that, though the plaintiff may be defeated in his claim of right to appropriate the natural overflow from the lake, it may be possible for him so to present the facts touching the use of the stored water that the court may decree him a substantial right in that behalf. This feature of the case seems to have been lost sight of by the court when it made its findings.

The decree and order are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. JUSTICE SMITH and MR. JUSTICE HOLLOWAY concur.